**MICHELLE HOLMAN KERIN, OSB #965278**
michelle@angelicalfo.com
ANGELI & CALFO LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

*Attorneys for Defendant Eduardo Sanchez*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>EDUARDO SANCHEZ,<br><br>Defendant. | Case No. 3:25-CR-00018-IM-1<br><br>**DEFENDANT'S SENTENCING MEMORANDUM** |

## INTRODUCTION

Eduardo Sanchez stands before this Court as a man who has endured a difficult life and has never really been given a break in it. One November morning in 2024, the weight of it all broke him, causing him to engage in the serious, harmful conduct that brought him to this Court. The record before this Court however shows that Mr. Sanchez is not just the 93 minutes he spent threatening AV1 and others. Instead, across his 41-years, Mr. Sanchez has lived a life that is essentially crime-free — two misdemeanors and a single criminal history point. PSR ¶¶ 52–54. He has worked hard in his employment to be a provider and financially self-sufficient. PSR ¶ 75; Ex. A. He is a good neighbor and member of his community. And, most significantly, he continues to address his struggles with alcohol and mental health, built from a lifetime of trauma

and rejection. PSR ¶¶ 23, 67, 73. The full record before this Court shows that Mr. Sanchez is considerably more than the conduct he engaged in on November 23, 2024, and as a result he should be sentenced to a time served sentence, with sufficient supervised release conditions to ensure that he continues treating his mental health and alcohol issues. Alternatively, if the Court believes additional custodial time is necessary, it should be served with home confinement.

Time served is not a pass. The government recommends eight months and Mr. Sanchez has already spent a month and eleven days in a federal cell, two months in a halfway house, and almost two years on GPS, alcohol monitoring, curfew, and drug testing. PSR, Face Sheet; ¶¶ 14, 16, 17, 20a. He carries a federal felony for life and faces three more years of supervision and a court-ordered duty to support children he is not permitted to see. Punishment, deterrence, protection of the public, and treatment in the most effective manner are all served by that sentence. He is asking this Court to let the custodial time he has already served be enough, and to give him the first break anyone has ever given him: a sentence that lets him keep working, keep paying, keep going to treatment, and keep becoming the person the people around him believe he is.

## DISCUSSION

### I. THE HISTORY AND CHARACTERISTICS OF THE MAN BEFORE THIS COURT

#### A. A Boy Nobody Protected

Eduardo Sanchez was born in Los Angeles in the summer of 1985. His father left shortly after his birth and has never been heard from since. PSR ¶ 60.

By the time he was three, the family was living in a shed due to financial difficulties. *Id.* He nearly died of asthma more than once before he was six, and when a doctor finally told his mother the city air was killing her son and the family had to move, she decided the disruption

was his fault and punished him. She beat him. She woke him in the middle of the night and made him stand in cold water. *Id.* When he was seven, a stepfather came into the house and, for a while, tried to shield him; his mother put a stop to that, and the man who had protected him was made to join in instead. Both adults drank. The house ran on weekend parties and fights that started when the parties ended; his stepfather was jailed more than once for domestic violence. *Id*.

When asked about his parents' drinking, Mr. Sanchez said they were easier to deal with when they were drunk. *Id*. That was the lesson Mr. Sanchez, then a small boy, took from that house about what alcohol is for, and he has been unlearning it ever since.

He did not complete traditional school: his mother would not always drive him, so he was marked absent and later suspended for those absences; he could not do homework in his house because of the chaos, and his grades ultimately collapsed. PSR ¶ 74. By twelve, he stayed away for days at a time, sleeping at friends' houses or in a park. PSR ¶ 61. And at seventeen, he left for good and did not go back. *Id.*

On the Adverse Childhood Experiences questionnaire, Mr. Sanchez reported nine of the ten categories, and Probation noted further trauma the instrument does not capture, including his father's absence and the years he ran away from home as a child. PSR ¶¶ 68–70. The CDC research the Presentence Report itself sets out ties that exposure to depression, anxiety, PTSD, suicide, and alcohol abuse: the very afflictions Mr. Sanchez went on to develop. PSR ¶ 68.

**B. The Life He Built**

Despite his traumatic childhood, Mr. Sanchez has never stopped working. While he dropped out of high school to support himself, at twenty-five, with no court, employer, or parent requiring it of him, he sat for and passed his GED. PSR ¶ 74. His employment history since 2020 is unglamorous and unbroken: a potato factory, Taco Bell, a series of gas stations, then Carl's Jr.,

where he was promoted to full-time Shift Lead and now, PerfoMix Nutrition Systems. PSR ¶¶ 75, 77 and Confidential Supplement to the PSR, Exhibit A. On his days off he crawls under his neighbors' cars and fixes them for nothing, and he hopes one day to make a living doing it. PSR ¶¶ 76, 74. He has never had money. He owes nine thousand dollars on his vehicle and four thousand more in personal loans, he qualified for appointed counsel, and Probation concluded he cannot pay a fine. PSR ¶ 77.

Mr. Sanchez has also committed to making his community a better place. He has volunteered at Project Dove in Ontario, Oregon, a nonprofit organization that provides services to victims of domestic violence and sexual assault, human trafficking and stalking in Malheur County. The mission of the organization is to break the cycle of domestic and sexual violence community through awareness, prevention, and intervention. In 2021, he was named volunteer of the year for his dedication and work:




He assists his neighbor in caring for her autistic son and he has helped his community remove graffiti from a wall surrounding a local lake. In short, Mr. Sanchez tries to make his community better and contributes in meaningful ways both to his neighbors and to core community organizations serving its most vulnerable populations.

He also tried, twice, to have a family, and lost both.

The first was a girlfriend he moved in with at seventeen; they had a daughter, Alejandra, who is now eighteen, and the relationship ended before she turned two. PSR ¶ 61. The second was Elaina Sanchez, whom he married in 2012. That marriage brought three more children, now fourteen, thirteen, and eleven, and, in the middle of it, two cardiac ablation surgeries in 2015 and 2016 for an irregular heartbeat. PSR ¶ 62, ¶ 63. They had a tumultuous divorce in 2020 and out of deep desperation which later morphed to significant remorse, Mr. Sanchez signed away his parental rights to his three youngest children so that their mother would obtain the minimum support obligation against him. PSR ¶ 29, ¶ 63. He has not spoken to his children in four years. PSR ¶ 63. This has impacted him significantly, leading in part, to his catastrophically poor choices on November 23, 2024. Indeed, he told Probation, without dressing it up, what he did after signing away his parental rights and being separated from his children: he drank to forget them. PSR ¶ ¶ 66, 72.

**C. The Unraveling**

Mr. Sanchez had his first drink at thirteen. PSR ¶ 72. It became regular at twenty-one, and by the period leading up to this offense he was having a tall beer before his shift and another at midday. *Id.* Asked what sets him off, he named three things, and every one of them is the same thing: his family, his children, and "depressing topics." PSR ¶ 73.

Underneath the drinking is a diagnosed and serious illness: depression, anxiety, and post-traumatic stress disorder.[1] PSR ¶ 66. The years after his divorce were, in his own words, the darkest of his life.[2] He burned himself while intoxicated. *Id.* He has never attempted suicide

[1] These diagnoses are confirmed by medical records obtained by defense counsel from his medical providers.

[2] This was confirmed by defense counsel in an interview of Mr. Sanchez's neighbor and friend.

though on three separate times, he checked himself into an inpatient psychiatric hospital because he was thinking about dying. *Id.*

And then the State raised his child support.

The modified order was finalized in September 2024 and set his obligation above five hundred dollars a month. PSR ¶¶ 23, 25, 65. He asked to have it recalculated against the income he actually had, and the request was denied in October 2024. He was told he could not ask again unless his circumstances substantially changed. PSR ¶ 26. What would be left of his paycheck after the garnishment was roughly three hundred dollars every two weeks. He was going to lose his apartment, his car, and he feared the worst: he would be homeless and penniless. PSR ¶ 31.

As a result, his third psychiatric hospitalization came after that increase and before the offense in this case. PSR ¶ 66. He came out of the hospital with an appointment to get back on his psychiatric medication, though he never made it because he was arrested for the instant offense first. PSR ¶ 30.

The man who picked up the telephone at 5:54 in the morning on November 23, 2024 was untreated, unmedicated, weeks out of a psychiatric ward, drinking before dawn, and facing homelessness over a bill he could not pay for children he was no longer allowed to see.

**D. Twenty Months of Proving it**

Almost two years have passed since that morning, and the government's memorandum treats them as if they were a waiting period. They were not. They are the best evidence in this case of who Mr. Sanchez actually is.

The defense concedes, Mr. Sanchez's supervision did not begin well and has not been without stumbles. As this Court knows, within two months of his release, he had violated by failing to report, using marijuana, drinking, and failing to test, and he was taken into custody. PSR ¶ 13. He was released to the Northwest Residential Re-Entry Center in March 2025 and

placed in treatment through Volunteers of America. PSR ¶ 14. By late May 2025, the Court was told he was actively engaging in services and making successful progress, and he asked to go home to Ontario so he could continue treatment there. PSR ¶ 16. He relapsed on alcohol that July. PSR ¶ 17. That December he was found in violation for failing to participate in remote alcohol testing and in response he agreed to more urinalysis testing. PSR ¶ 18. Within a month the Court was relaxing his conditions because of his compliance. PSR ¶ 19. He drank two beers in late May of this year and was not straightforward about it when first asked, and in June the Court tightened his conditions again.[3] PSR ¶ 20a.

After that June hearing, he went back into treatment and restarted his counseling (which was temporarily derailed by his counselor moving). He has been at it since. He has remained in mental health treatment throughout this case. He also continues to attend Alcoholics Anonymous and to sit in church listening to other people's stories about getting better, PSR ¶ 73, and he has not touched marijuana since February 2025, PSR ¶ 71.

Meanwhile he kept working, his supervising officer confirms he has held a job throughout, and in the last year he moved to PerforMix Nutrition Systems in Fruitland, Idaho. PSR ¶ 20; Conf. Supp. to PSR, Ex. A. His supervisor there has written to this Court. She describes an exceptional worker: incredibly reliable, consistently on time, an excellent attendance record, and a sense of accountability that stands out on a fast-paced floor. She calls him trustworthy, says he takes his commitments seriously, and says the team is glad to have him.

[3] Defense counsel understands there is currently a pending allegation of Mr. Sanchez's violation of pretrial release, relating primarily to the possession (not use) of alcohol. While an officer has shared some details of the allegations, defense counsel has not seen the violation report and neither Mr. Sanchez's officer in Idaho nor the one in Oregon have returned calls (due to planned vacations) to provide important information missing from the report and/or crucial to meaningfully addressing the alleged violation with the Court.

And she reports that PerforMix has decided to move him out of temporary status into a permanent, full-time job, that the company is "proud to invest in him," and that she gives him her highest recommendation.

## II. THE OFFENSE CONDUCT

There is no dispute that over roughly ninety minutes on November 23, 2024, Mr. Sanchez left six voicemails threatening to buy a handgun, drive to Pendleton, find his caseworker, shoot her in the face, and shoot everyone else in the office. PSR ¶ 21. Mr. Sanchez understands that the specificity of these threats is particularly heinous and that the harm endured by AV1 and others was real. Mr. Sanchez asks the Court to understand how a man with no history of violence, PSR ¶ 31, who owns no firearm and does not want one because of his own mental health history, PSR ¶ 30, made such horrible choices that morning.

Mr. Sanchez had been ordered to pay what he could not and believed it would be ruinous. The modified order was finalized in September 2024. PSR ¶ 25. He had lost or left his job. PSR ¶ 23, ¶ 26. He sought modification based on income verification; AV1 denied it in October 2024 and barred him from refiling absent a substantial change in circumstances. PSR ¶ 26. The obligation exceeded $500 a month, PSR ¶ 63, leaving roughly $300 per biweekly paycheck. PSR ¶ 31. He believed the calculation rested on income he no longer earned and that he had run out of doors to knock on: AV1 had not returned his calls and he "finally snapped," PSR ¶ 30; he was fighting homelessness, PSR ¶ 31; he had exhausted every avenue he knew how to use, PSR ¶ 32.[4]

---

[4] Mr. Sanchez understands that he did not appear at the administrative hearing and he failed to appeal within ninety days. PSR ¶ 25. He knows now that he failed to use some recourse offered however, given his mental state at the time, it was difficult to follow through and he did not fully appreciate the consequences for failing to do so.

In that same window he was drinking before work and at midday, PSR ¶ 72, carrying untreated PTSD and depression, PSR ¶ 66, and checked himself into psychiatric care for suicidal ideation after the obligation increased and before this offense, *id*.

He does not now, or ever, offer any of this as an excuse for his conduct. Within forty-eight hours of discovery, before any warrant issued, he contacted the Ontario Police Department himself, confessed and said he had been intoxicated, not in his right mind, and apologized repeatedly. PSR ¶ 23. After his arrest in this case, he told agents, unprompted, that he never intended to hurt anyone, PSR ¶ 32; that he feared he had thrown away the progress he made at work, PSR ¶ 28; and, arranging for a friend to feed his cat, that he had done this to himself, PSR ¶ 32.

There are other aspects that provide context of the offense conduct the Court should consider as well:

- The course of his criminal conduct was one morning. Six voicemails to a single office on a single subject, 5:54 a.m. to 7:27 a.m. PSR ¶ 21.

- Nothing about the conduct was planned and the recordings demonstrate this. Mr. Sanchez had no working car, he needed to "get my car running" and was "getting my car fixed tomorrow." PSR ¶ 21(1), (6). He had no firearm; he described buying one for $240 with a paycheck he had not received. PSR ¶ 21(3). He gave his own name and the last four digits of his Social Security number, PSR ¶ 21(2), and his callback telephone number, PSR ¶ 21(4). He did not know his caseworker's name. PSR ¶ 30. He "snapped." PSR ¶ 30.

- The conduct is inconsistent with the rest of his life. Forty-one years and two 2020 misdemeanors: refusing a trooper's order to let his vehicle be towed (zero points), PSR ¶ 52, and a DUI (one point), PSR ¶ 53. One criminal history point. PSR ¶ 54. No juvenile record, no other criminal conduct, no pending charges, no other arrests. PSR ¶¶ 51, 55–57. No history of violence. PSR ¶ 31. The government concedes he has "no prior record of threatening behavior." Gov't Mem. at 6.

- Twenty months of federal supervision have tested him. Through a halfway house, GPS, curfew, location monitoring, and up to twelve urinalyses a month, the record contains no threat, no contact with AV1, no violence, no weapon, and no new charge. Every violation is an alcohol or testing violation; as this Court knows, it is not

> unusual for defendants on pretrial release to struggle with relapse. PSR ¶¶ 13, 17, 18, 20a.

Again, this context is not offered as an excuse. Mr. Sanchez's conduct was improper and had devastating impact. But it does provide the Court with insight on the extreme mental state Mr. Sanchez was in at the time of his illegal actions and demonstrates that this singular act does not show a man who is dangerous; but rather a man who was, on one morning, drunk, ill, desperate, and catastrophically wrong.

## III. THE SENTENCING GUIDELINES.

The fundamental tenet of federal sentencing is clear: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. §3553(a)(2)]." 18 U.S.C. § 3553(a). In applying this principle, courts are instructed to take a comprehensive view of the individual and the offense, weighing a variety of factors to arrive at a just sentence. The Sentencing Guidelines serve as one such factor, but no more than that. As the Ninth Circuit has explained, the Guidelines are only "one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence," and they are not to be given "more or less weight than any other." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc).

A thorough application of the § 3553(a) factors confirms a variance from the government's recommendation of eight months is warranted. Mr. Sanchez has one criminal history point for a DUI. He quickly turned himself in, has pled guilty, and has worked hard to address the long-standing, serious and heartbreaking underlying medical and mental issues that brought him to that horrible morning in November 2024. He carries the weight of what he did and the harm it caused to people every day. The Court is respectfully asked to weigh the full

measure of this man's life as it considers a sentence sufficient, but not greater than necessary, to serve the purposes of justice.

### A. Agreed Upon Guidelines Calculation

The parties agree the following Guidelines are applicable:

| | |
|---|---|
| Base Offense Level (USSG §2A6.1(a)(1)) | 12 |
| Disruption to Government Functions or services (USSG §2A6.1(b)(4)(A)) | 4 |
| Acceptance of Responsibility | -3 |
| Government Agreed Variance 18 U.S.C. §3553(a) (-2 early resolution) | -2 |
| **Total Offense Level** | **11** |

A total offense level of 11 yields an advisory sentencing range of 8-14 months. The government is recommending eight months imprisonment. The Court should impose a further variance and impose a sentence of time-served, or alternatively, home confinement if the Court believes additional custodial time is required.[5]

### B. The Victim Enhancement Should Not Apply

The Court should not impose the three-level enhancement because the victim was a government officer and the offense of conviction was motivated by such status, pursuant to USSG §3A1.2(a)(1)(A)(2). The defense understands that while the offense conduct technically falls within the definition of this enhancement, as outlined in the PSR, the parties believe that the four point government disruption enhancement under USSG §2A6.1(b)(4)(A), more accurately approximates the harm caused by Mr. Sanchez's conduct.

[5] The defendant has already spent more than a month in jail and two months in a half-way house—almost half of the time requested by the government. Moreover, he has also served a significant part of his release on onerous conditions, including curfews and electronic monitoring.

If the Court determines it must impose the enhancement, it should honor the parties' agreement and impose a sentence that varies from it.

## IV. A VARIANCE TO TIME-SERVED IS APPROPRIATE TO FULFILL THE GOALS OF SENTENCING.

### A. Specific Deterrence

Mr. Sanchez has lost much because of this case and is not likely to reoffend. Indeed, over the last 20 months of supervision, Mr. Sanchez has not contacted the victim or engaged in any similar behavior. As such, the record before the Court shows specific deterrence is achieved. *See Pepper v. United States*, 562 U.S. 476, 488 (2011) (courts must consider risk of reoffending); *United States v. Campbell*, 762 F. App'x 877, 879 (11th Cir. 2019) (noting that the District Court's "44-month downward variance reflected the court's consideration of [the defendant's] characteristics, including his age, low risk of recidivism, and family relationship and of the seriousness of his criminal history[]").

### B. General Deterrence

General deterrence is satisfied with a sentence of time served (or alternatively, additional custodial time served in home confinement). A harsher sentence, given Mr. Sanchez's mitigating conduct, would undermine deterrence and disincentivize others who have engaged in criminal conduct from taking similar steps.

## V. THE REQUESTED SENTENCE PROTECTS THE PUBLIC AND SATISFIES RESPECT FOR THE LAW

The Court must also consider whether the sentence imposed "reflect[s] the seriousness of the offense, . . . promote[s] respect for the law, and . . . provide[s] just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). The requested sentence satisfies those goals.

### A. The Requested Sentence Promotes Respect for the Law.

Pleading guilty to a felony offense represents a severe consequence. As courts have recognized, probation or short terms of incarceration carry enormous weight for individuals with no criminal history. See *Watt*, 707 F. Supp. 2d at 158 ("Two years in a federal prison is a long time for someone who has never been to prison before.").

But prison is only one part of the punishment Mr. Sanchez will bear for the rest of his life. The indictment and conviction have disrupted Mr. Sanchez's life and triggered widespread scrutiny across the media. These consequences will be lasting and deeply damaging. See, e.g., *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007). Moreover, the proposed term of supervised release will be onerous and impose severe restrictions on Mr. Sanchez. In short, a time-served sentence, or alternatively a sentence of home confinement, promotes respect for the law.

### B. The Requested Sentence Protects the Public Because Mr. Sanchez is Not a Danger to the Community

A sentence of time served also protects the public. There is no indication in the record that Mr. Sanchez represents an ongoing risk to the community. While he has struggled at times with sobriety, with each setback, he has recommitted himself to his counseling and sobriety. Though the path has not been linear, it has improved over time. He continues to do the hard work to address his underlying issues and there is nothing in the record to suggest he is a danger. Additional time in prison will likely not protect the public in any meaningful way. Instead, the Court should impose a time served sentence and conditions, like the ones it has over pretrial release, to ensure he is supported in his mental health and addiction. That is a sentence aimed at protecting the public much more than simply giving Mr. Sanchez additional time in prison.

## VI. THE RECORD DEMONSTRATES MR. SANCHEZ'S CRIMINAL CONDUCT WAS AN ABERRATION

Mr. Sanchez comes before this Court with two prior misdemeanor convictions from 2020, around the same time as his divorce, a history of hard work and a commitment to bettering himself and his community.[6] The record demonstrates that this offense, though very serious, is an aberration and not part of a pattern.

Courts have long recognized that the aberrant nature of a defendant's criminal conduct can justify a downward variance. See *United States v. Working*, 224 F.3d 1093, 1099 (9th Cir. 2000); *United States v. Fairless*, 975 F.2d 664, 669 (9th Cir. 1992) ("A single act of aberrant behavior is a mitigating circumstance not taken into consideration by the Guidelines which warrants departure.") When it promulgated the Guidelines, the Sentencing Commission recognized that it was unable to fashion guidelines that could apply to every offense. In particular, the Commission acknowledged that in fashioning the Guidelines, it did not deal with "single acts of aberrant behavior that still may justify probation at high offense levels through departures." U.S.S.G., Ch. 1, pt. A, § 4(d). As a result, "the Guidelines recognize that the first offense may constitute a single act of truly aberrant behavior justifying a downward departure." *United States v. Dickey*, 924 F.2d 836, 838 (9th Cir. 1991); see also *United States v. Takai*, 941 F.2d 738, 741 (9th Cir. 1991) (affirming trial court's downward departure to permit probation for two first offenders who plead guilty to charges of bribery and conspiracy to bribe a federal agent because, among other things, the defendants' conduct were "single acts of aberrant behavior").

---

[6] Section 3553(a)(1) directs courts to consider "the history and characteristics of the defendant" when imposing a sentence. This inquiry is "broad." *Gall*, 552 U.S. at 50 n.6. As the Supreme Court reaffirmed in *Pepper v. United States*, sentencing should reflect "the widest possible breadth of information about a defendant," to "ensure[] that the punishment will suit not merely the offense but the individual defendant." 562 U.S. 476, 488 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).

"Aberrant conduct is conduct that represents a 'short-lived departure from an otherwise law-abiding life.'" *Working*, 224 F.3d at 1099 (quoting *United States v. Colace*, 126 F.3d 1229, 1231 (1997)). "Aberrant behavior is best assessed 'in the context of the defendant's day-to-day life' rather than solely 'with reference to the particular crime committed.'" *Working*, 224 F.3d at 1101 (citations omitted). When considering whether a defendant's behavior falls within the "spectrum of aberrant behavior," the Court may consider "a convergence of factors," *Fairless*, 975 F.2d at 667, including:

> (1) the singular nature of the criminal act, (2) spontaneity and lack of planning, (3) the defendant's criminal record, (4) psychological disorders the defendant was suffering from, (5) extreme pressure under which the defendant was operating, including the pressure of losing his job, (6) letters from friends and family expressing shock at the defendant's behavior, and (7) the defendant's motivations for committing the crime.

*Colace*, 126 F.3d at 1231 n.2. None of these factors standing alone is dispositive; the court must review the totality of the circumstances when making findings of aberrancy. *Working*, 224 F.3d at 1100–01 (citing cases).

The record shows that Mr. Sanchez's offense conduct constituted a singular departure from an otherwise, largely, law-abiding life. Given the above, a downward variance, to time-served, is warranted.

**CONCLUSION**

Eduardo Sanchez has spent his whole life absorbing things no one helped him carry — a dad who abandoned him, a mother who beat him, a childhood that scored nine out of ten on the Court's own measure of harm, three nights he checked himself into a hospital because he was thinking about dying, and three children he signed away so someone else could collect from him. PSR ¶¶ 60, 66, 69, 29. One morning in November 2024, drunk, unmedicated, and about to lose

his apartment, all of it came out of him at a woman who was only performing her job. He crossed a line and his conduct had real consequential impact on AV1 and others.

While his conduct that morning took place over ninety-three minutes, the twenty months since have been the rest of the answer: a month and eleven days in a cell, two months in a halfway house, GPS, curfew, twelve urine tests a month, therapy, meetings, two relapses, and a return to treatment in June after this Court told him to do more. PSR, Face Sheet; ¶¶ 14, 16, 20, 20a; Ex. C. His probation officer, who has watched all of it, calls him genuine. PSR ¶ 20. His employer, knowing everything, made him a permanent job offer last week because of his work ethic. Ex. A. His community depends on and entrusts him with their most fragile members.

Mr. Sanchez is not asking to be excused. He is asking to be allowed to keep going: to keep the job, keep the treatment, keep paying what he owes to his children, and keep helping his community. Mr. Sanchez has already served some of the time the government requests and that should be sufficient to fulfill the goals of sentencing. However, if the Court determines he needs more, he should be permitted to serve it as home confinement. The record shows that Mr. Sanchez has never been given a break; but he has spent twenty months earning this one.

DATED August 24, 2026

ANGELI & CALFO LLC

*s/ Michelle Holman Kerin*
MICHELLE HOLMAN KERIN, OSB No. 965278
michelle@angelicalfo.com
Attorney for Defendant Eduard Sanchez